567 So.2d 962 (1990)
ORLANDO GENERAL HOSPITAL, Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 89-976.
District Court of Appeal of Florida, Fifth District.
September 27, 1990.
James A. Burt and James A. Gustino of Burt & Gustino, P.A., Orlando, for appellant.
Richard C. Bellak and Hala Mary Ayoub of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tallahassee, for appellee.
PETERSON, Judge.
The Florida Department of Health and Rehabilitative Services (HRS) rendered a final order denying payment for the treatment of chemically-dependent Medicaid patients *963 in an administrative appeal from which Orlando General Hospital (OGH) appeals. We reverse.
After HRS refused payment for six patients based upon HRS's conclusion that treatment was not medically necessary, a formal hearing was held upon a petition for a formal administrative proceeding filed by OGH, pursuant to section 120.57(1), Florida Statutes. The hearing officer recommended that payment be made to OGH for the patients. HRS rejected the recommendation, indicating that the case was significant since it represented "the first formal challenge to a reimbursement denial" and that "[t]here is less deference to fact finding by the Hearing Officer in matters infused with overriding policy consideration." Baptist Hospital, Inc. v. Department of Health and Rehabilitative Services, 500 So.2d 620 (Fla. 1st DCA 1986), was cited in support of the last quoted "deference" rule. We will review later HRS's interpretation of the authority for the deference rule which is contrary to the rule that an agency may not substitute its own factual findings for those of the hearing officer unless it states with particularity in its order that the officer's findings of fact were not based on competent substantial evidence. B.B. v. Department of Health & Rehabilitative Services, 542 So.2d 1362 (Fla. 3d DCA 1989); see also § 120.57(1)(b)(10), Fla. Stat. (1987).[1]
HRS urges that a treating facility should be paid to provide only necessary hospital care and should not be paid for what HRS views as a liberal "cost-is-no-object" approach to care of indigent patients who are drug addicts and alcoholics. There can be no doubt that HRS's concern for protecting public funds is admirable and in conformity with the duties assigned to it. On the other hand, medical providers are placed in an awkward position where reimbursement by HRS may be denied. Medical providers are constantly supplied with new, more sophisticated, and more costly tools with which to administer treatment, and the failure to use these tools may be regarded by some as tortious.
In this case, OGH used inpatient treatment while HRS found alternative, less costly, outpatient centers were available and that the physicians at OGH did not consider these alternatives in prescribing treatment. The hearing officer appropriately found that the test to apply to OGH's claim for Medicaid reimbursement is whether the treatment was a "medical necessity." Rules 10C-7.039(1)(a) and 10C-7.039(4)(a)(3) of the Florida Administrative Code allow reimbursement for inpatient hospital services under the Medicaid program only if those services are medically necessary. The hearing officer also found that it appeared no statutory definition of the term "medically necessary" existed, but determined from an unreported case furnished to her by HRS that a service is medically necessary if:
a. The requested service is reasonably calculated to prevent, diagnose, correct, cure, alleviate, or prevent the worsening of conditions in the recipient that: (i) endanger life; or (ii) cause suffering or pain; or (iii) result in illness or infirmity; or (iv) threaten to cause or aggravate a handicap; or (v) cause physical deformity or malfunction; and
b. There is no other equally effective (i) more conservative, or (ii) substantially less costly course of treatment available or suitable for the recipient requesting the service. For the purpose of this section "course of treatment" may include mere observation or, where appropriate, no treatment at all.
Mead v. Burdman, case number 818663, Superior Court, State of Washington for *964 King County, Consent Order, May 20, 1978. HRS's final order stated that the twopronged test adopted by the hearing officer was correct, that is, whether the admission and treatment alleviated a harmful medical condition as the first prong and whether treatment could have been provided in a more economical setting than an acute care hospital as the second prong.
Several of the hearing officer's findings of fact relating to the second prong were rejected by HRS. The rejections included the hearing officer's finding that the results through Medicaid screening criteria, published by Interquality Publishers, are not binding upon physicians and that OGH complied with a Medicaid system of utilization review regarding the patients. The Medicaid screening criteria are referred to by those in the industry as "ISD screens," an acronym for "intensity of service, severity of illness, and discharge." ISD screens are applied to each patient admission by a registered nurse who is a "utilization review coordinator." The coordinator is an integral part of a "utilization review plan" that the federal regulations require each hospital to have in effect in order to ensure that each Medicare patient meets medical necessity criteria for admission. If the coordinator determines that a patient does not meet the ISD screen criteria, the matter is referred to a "utilization review physician" who then confers with the patient's attending physician if he feels initially that the criteria are not met. If both physicians feel that the criteria are not met, a third physician may be brought into the process. The review does not end at this point, however. After the treatment is completed and payment is requested, the decision to provide inpatient services is reviewed for HRS by a peer review organization (PRO). In the instant case, it was PRO's initial determination that the treatment "was not medically necessary because it could have been provided in an outpatient setting" that precipitated OGH's hearing before the hearing officer.
At the hearing, HRS presented an ISD-9 screen, and an OGH physician/witness testified he had seen the screen but had not used it in relation to the six disputed patients. The physician explained that the screen was designed for psychiatric admissions and that, while there may be overlapping applications for chemically-dependent patients, use of the screen for chemically-dependent patients would be inappropriate. Another OGH physician/witness used criteria that were not derived from Medicaid rules because he had never seen them. A PRO representative testified that, if a patient's symptoms did not fit within the screens, the "system" allows the utilization review physicians or "committee" to make a decision as to medical necessity completely independent of the ill-fitting screen. HRS's physician/witness, Dr. Macaluso, testified that ISD psychiatric criteria are "conditionally relevant to chemical dependencies but that there is certainly debate in this field." While he disagreed that the criteria used by OGH physicians for admission to the acute care hospital were appropriate, he did not think any physician is absolutely bound by the ISD psychiatric screen criteria. He testified, "If we admit ... Medicaid patients, to some extent we're limited by those criteria. And we can override them. I have done it."
The record also reveals that detailed testimony was devoted to the conditions and symptoms of the individual patients to which the criteria were applied. While the experts may have disagreed on some aspects of treatment, they all agreed that physicians could override the ISD screen criteria. The hearing officer resolved those conflicts with findings of fact, necessarily rejected some testimony and accepted others, and found that a utilization review procedure had been in use. The hearing officer's acceptance, rejection, and findings were based upon substantial, competent evidence found in the record, and HRS was not free to substitute its findings nor make new findings. B.B. v. Department of Health & Rehabilitative Services, 542 So.2d 1362 (Fla. 3d DCA 1989); South Fla. Water Mgt. Dist. v. Caluwe, 459 So.2d 390 (Fla. 4th DCA 1984); § 120.57(1)(b)(10), Fla. Stat. (1987).
HRS misapplies the Baptist Hospital rule when it contends that the agency need *965 give less deference to fact finding by the hearing officer in matters infused with overriding policy considerations. The Baptist Hospital opinion indicated that "[m]atters that are susceptible of ordinary methods of proof, such as determining the credibility of witnesses or the weight to accord evidence, are factual matters to be determined by the hearing officer." 500 So.2d at 623. The court found in First Baptist that the hearing officer correctly determined that the hospital offered skilled rehabilitation nursing care on a regular basis, and that such constituted comprehensive medical rehabilitative service. This matter was held to be determinable by ordinary methods of proof. But the manner in which these services were provided involved overriding agency considerations reserved to agency discretion. The manner in which the services had been provided was found by HRS to have been provided in different parts of Baptist Hospital's facility as opposed to having been provided in a distinct unit of the hospital as required by HRS's interpretation of Florida Administrative Code Rule 10-5.11(24). Thus, in Baptist Hospital, HRS exercised its discretionary authority to interpret its own rules to require that, before a certificate of need could be issued, the rules required consolidated rehabilitation services to have been offered for a 12-month period in a distinct unit rather than in different parts or locations of the hospital. We are not concerned in the instant case with the interpretation of an administrative rule to satisfy the second prong of the "medically necessary" rule. The term "medically necessary," although included in Rules 10C-7.039(1)(a) and 10C-7.039(4)(a)(3), was defined by HRS for use by the hearing officer when it supplied the officer the definition set out in the Mead opinion. The hearing officer then made the findings of fact in compliance with the second prong of the definition.
The second prong of the definition of "medically necessary" requires a finding that no other equally effective course of treatment is available or suitable that is more conservative or substantially less costly. HRS's final order recited, "The Medicaid program routinely transports patients across the state in pursuit of the most cost-effective facility, and there is no basis for justifying hospitalization merely for lack of a less costly and appropriate facility in the immediate vicinity." This recital was used to negate the idea that the Orlando area where OGH is located is the appropriate geographic measure of the availability of less costly treatment alternatives. The record indicates that HRS did not present any such information at the hearing. This factfinding beyond the record by HRS is prohibited. See, e.g., B.B. v. Department of Health & Rehabilitative Services, supra; Sneij v. Department of Professional Regulation, Bd. of Medical Examiners, 454 So.2d 795 (Fla. 3d DCA 1984); Borovina v. Florida Constr. Industry Licensing Bd., 369 So.2d 1038 (Fla. 4th DCA 1979); Austin v. Gordon, 333 So.2d 118 (Fla. 2d DCA 1976).
HRS's physician/witness, Dr. Macaluso testified that, while the acute hospital inpatient treatment offered by OGH was not required for the patients involved in the case, highly structured, residential programs were required for some of the patients. When asked if he knew of any such residential programs in the area, he was unable to name them. No one asked him about programs outside the area to support HRS's post-hearing finding that transportation of patients to such facilities was routinely available. While Dr. Macaluso disagreed with the other physicians/witnesses that hospital admissions were medically necessary for the OGH patients, the hearing officer had to resolve the differences in testimony by weighing the evidence, observing the demeanor of the witnesses, and judging their credibility. There was more than ample competent, substantial evidence to support her findings in the recommended order.
We agree with HRS that referral of patients to alternative treatment facilities in the place of $500 per day acute hospital inpatient treatment centers is an urgent policy consideration that is required to preserve scarce funds for patients who truly *966 have no alternative to hospitalization. The medical determination of those who qualify for hospitalization is a difficult task and a risky one for physicians and hospitals in today's litigious society. Both of these policy considerations require more appropriate ISD screens for substance abusers than screens appropriate for psychiatric patients. Whatever criteria are dictated for use in selecting the mode and intensity of publicly funded treatment should be more precise than is demonstrated in this case. An after-the-fact determination that a provider of medical services to indigent substance abusers is not entitled to payment under a public program when the provider followed prescribed broad procedures which, as was established by all witnesses in this case, can be overridden by the treating physician, is simply unfair. The final order of HRS is reversed with instructions to enter an order in conformity with the recommended order of the hearing officer.
REVERSED.
COWART and HARRIS, JJ., concur.
NOTES
[1] This section provides: "The agency may adopt the recommended order as the final order of the agency. The agency in its final order may reject or modify the conclusions of law and interpretation of administrative rules in the recommended order, but may not reject or modify the findings of fact unless the agency [HRS] first determines from a review of the complete record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law... ."